IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| MADJID BERD, LOIC BOUCHET, FABIEN RAVAILHE, THIERRY BRUNEAU, LIONEL AND BEATRICE TORRECILLA, BRUTORRE LLC, ALAIN AND JOSCELYNE LUZUY DE MAILLARGUES, SOFIFLOR LLC, THIERRY DUSOLEIL, PROBAE INVEST LLC, AGNES FERRARIS, DOMINIQUE FRATACCI, SANDANIELLU INVESTMENTS LLC, DOMINIQUE AND BRIGITTE GARSI, BD DAK'INVEST LLC, GILLES AND HELENE GLEIZES, GLAMI LLC, LAURENT GRAESEL, FRANCOIS HETIER, HETIER LLC, CHRISTIAN AND BLANCHE JEAN, THIERRY JUNGMICHEL, T.J. AND CO LLC, ALAIN LECANUET, GWENDOLINE MONIEZ, DAKOLINE LLC, STEPHANE PERROTTE, KNET LLC, ROMAIN REBOUL, DAKOLAND LLC, LAURENCE RICOUARD, MARC ROBIOLLE, MAMICI DAKOTA LLC, MONIQUE SIRGUE, and RAPHAEL WINTERSTEIN, | **CASE NO. _____** <br><br> **COMPLAINT AND JURY DEMAND** |
| Plaintiffs, | |
| vs. | |
| PAUL DE BASTOS AND PAUL REAL ESTATE, INC., | |
| Defendants. | |

**COME NOW** Plaintiffs, by and through their undersigned counsel, and in support of their

Complaint and Jury Demand state to the Court the following:

## I. SUMMARY

1.      Defendants Paul De Bastos and Paul Real Estate, Inc. (collectively referred to as

"Defendants") offered and sold to Plaintiffs, and actively assisted North Dakota Developments,

LLC ("NDD") in offering and selling, unregistered, nonexempt and fraudulent securities from approximately May 2012 to April 2015.  Specifically, Defendants acted as NDD's agents in connection with offering and selling interests in certain modular housing units coupled with management agreements—"investment contracts" under North Dakota and federal law—to hundreds of domestic and foreign investors including Plaintiffs.

2.     The investments Defendants sold on NDD's behalf were securities in the form of Land Lease and Management Agreements and membership units in four commercial housing developments for workers in the Bakken oil field region of western North Dakota and eastern Montana—so-called "man camps" intended to house oil and gas workers.  The four developments were known as Great American Lodge – Watford City West, Great American Lodge – Culbertson, Transhudson – Parshall, and Great American Lodge – Watford City East.

3.     These NDD investment contracts and membership units offered and sold by Defendants to Plaintiffs are securities under North Dakota and federal law.  *See* N.D.C.C. § 10-04-02(19); *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946); Section 2(a)(1) of Securities Act (15 U.S.C. 77b(a)(l)) and Section 3(a)(10) of the Securities Exchange Act (15 U.S.C. 77b(a)(1)) (defining "security" as including "any . . . participation in any profit-sharing agreement [or] . . . investment contract").

4.     The offerings and sales of these investment contracts and membership units represented an integrated offering of securities (as further discussed below), generally referred to below as the "NDD Offering."

5.     NDD made the NDD Offering through general advertising, including an internet website, print and online advertisements, e-mail solicitations, seminars, direct in-person solicitations, conference calls, videos, and flyers. NDD also utilized sales agents including

1

Defendants, who were paid commissions of at least 10 percent and sometimes as much as 20 percent of the amounts invested by the investors they recruited.

6.      NDD ultimately raised approximately $62 million in connection with the fraudulent NDD Offering.

7.      None of the securities sold in connection with the NDD Offering were registered with the Securities and Exchange Commission or any state securities regulator including the North Dakota Securities Department, nor were they exempt from registration.

8.      None of the securities sold in connection with the NDD Offering were sold by or through a broker-dealer or agent registered under N.D.C.C. § 10-04-10.  None of the Defendants were broker-dealers or registered agents of a broker-dealer.

9.      Therefore, sales made by NDD's sales agents including Defendants were in violation of N.D.C.C. § 10-04-04 and N.D.C.C. § 10-04-10, and render such agents strictly liable – and jointly and severally liable together with NDD – to the NDD investors, including Plaintiffs.

10.      The offering materials of the NDD Offering contained material misrepresentations and failed to disclose material facts necessary to make the statements made in the offering documents, in light of the circumstances under which they were made, not misleading, in violation of N.D.C.C. § 10-04-04 and N.D.C.C. § 10-04-10. Among others, they failed to disclose that the NDD securities were indeed securities, and instead portrayed such securities as investments in real estate; they failed to disclose to investors that the NDD Offering was unregistered and nonexempt, thus in violation of the federal and North Dakota's securities laws and regulations; they failed to disclose that NDD was paying huge sales commissions to the selling agents, and that such agents were unlicensed; they also failed to disclose that NDD and its principals were misusing and misappropriating investor money and NDD was a fraud.

11.     Defendants offered and sold the North Dakota-issued, unregistered and fraudulent NDD securities, and actively assisted the North Dakota-based NDD and its principals' perpetration of the unlawful NDD Offering of securities to Plaintiffs and others.   Among others, Defendants communicated numerous times with North Dakota-located agents of NDD; traveled to North Dakota to meet with NDD in connection with their promotion of NDD securities to investors; obtained and sent promotional documents to NDD and its agents in North Dakota; approached prospective NDD investors and urged them to purchase the North Dakota-issued NDD securities; directed NDD investors to send their investment-related paperwork as well as their investment proceeds to North Dakota agents of NDD; and received outrageously high sales commissions from investor funds wired to North Dakota.

12.     As NDD's unlawful sale of unregistered securities and other unlawful conduct began coming to light, the Securities Exchange Commission brought suit against NDD, its principals Robert Gavin and Daniel Hogan, and various other relief defendants, alleging violation of the federal securities laws.  *See* SEC v. North Dakota Developments, LLC et al., U.S. District Court, District of North Dakota, Case. No. 15-00053.

13.     At the SEC's request, attorney Gary Hansen was appointed Receiver for NDD. According to the Receiver's initial report dated June 26, 2015, despite diligent efforts he had only located approximately $175,000 in cash and liquid assets owned by NDD.

14.     The North Dakota Securities Commissioner also served a cease and desist order on Defendants, ordering them to cease and desist from, among other things, offering for sale or selling unregistered non-exempt securities in North Dakota.

15.     Plaintiffs now bring this action against Defendants for statutory damages arising from Defendants' actions as NDD's sales agents and their conduct in actively assisting NDD in

connection with the unlawful NDD Offering. *See* N.D.C.C. § 10-04-17 (providing that every "agent of or for [a] seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser.").

16.     Plaintiffs' claims against Defendants are for strict liability arising out of Defendants' sales of NDD unregistered and fraudulent securities, and Defendants' sales of securities as unregistered agents, in violation of the North Dakota securities laws. No allegations of fraud or knowing or intentional misconduct are being made against Defendants.

## II.  JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1367(a), 28 U.S.C. § 1331, as this case arises under the laws of the United States.

18.     This Court has personal jurisdiction over Defendants because, among other things, Defendants: actively recruited investors to invest in a North Dakota company; brokered the sale of interests in North Dakota real property and of North Dakota-issued securities; received fraudulent offering documents from North Dakota and directed communications to North Dakota, pertaining to their fraudulent sales of NDD securities; received commissions from North Dakota in connection with their sales; directed investor funds and investment-related paperwork to be sent to a North Dakota law firm in connection with the sales; communicated extensively with various North Dakota entitles in connection with the sales; and, acted as a necessary intermediary in connection with a fraud emanating from North Dakota.

19.     Venue is proper under 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of property that is the subject of the action is situated in this District.

4

### III.  PARTIES

20.     Plaintiffs are individuals and entities who purchased the unregistered NDD investments from Defendants and were damaged as a result.  Plaintiffs' names, claimed damages, and investment dates are as follows:

a.      Madjid Berd, a French national, invested a total of $62,995.00 in NDD between December 2013 and February 2014, all through Defendants.

b.      Loic Bouchet and Fabien Ravailhe, both French nationals, each invested a total of $36,185.00 (for a combined total of $72,370.00) in NDD in July and October 2014, all through Defendants.

c.      Thierry Bruneau and Lionel and Beatrice Torrecilla, all French nationals, through Brutorre LLC, invested a total of $201,996.93 in NDD between November 2013 and October 2014, all through Defendants, and received back $11,425.81 that had not yet been transferred to NDD when the scheme collapsed.

d.      Brutorre LLC is a North Dakota entity fully owned and controlled by Mr. Bruneau and the Torrecillas that served as an investment vehicle for their investments in NDD described above.

e.      Alain and Joscelyne Luzuy de Maillargues, both French nationals, through SOFIFLOR LLC, invested a total of $123,488.00 in NDD between October 2013 and November 2014, all through Defendants.

f.      SOFIFLOR LLC is a Florida entity fully owned and controlled by the de Maillargueses that served as an investment vehicle for their investments in NDD described above.

g.      Alain and Joscelyne Luzuy de Maillargues individually invested an

5

additional total of $94,783.50 in NDD in July 2014, all through Defendants.

h.     Thierry Dusoleil, a French national, through Probae Invest LLC, invested a total of $382,540.00 in NDD in September and December 2014, all through Defendants, and received back $220,803.50 that had not yet been transferred to NDD when the scheme collapsed.

i.     Probae Invest LLC is a North Dakota entity fully owned and controlled by Mr. Dusoleil that served as an investment vehicle for Mr. Dusoleil's investments in NDD described above.

j.     Agnes Ferraris, a French national, invested a total of $68,905.00 in NDD in May and June 2014, all through Defendants.

k.     Dominique Fratacci, a French national, through SANDANIELLU INVESTMENTS LLC, invested a total of $159,358.00 in NDD in November 2013 and March 2014, all through Defendants.

l.     SANDANIELLU INVESTMENTS LLC is a North Dakota entity fully owned and controlled by Mr. Fratacci that served as an investment vehicle for Mr. Fratacci's investments in NDD described above.

m.     Dominique and Brigitte Garsi, both French nationals, through BD DAK'Invest LLC, invested a total of $161,591.00 in NDD in August 2014.

n.     BD DAK'Invest LLC is a North Dakota entity fully owned and controlled by the Garsis that served as an investment vehicle for the Garsis' investments in NDD described above.

o.     Gilles and Helene Gleizes, both French nationals, through Glami LLC, invested a total of $65,250.00 in NDD in February and March 2014, all through

6

Defendants.

p.    Glami LLC is a North Dakota entity fully owned and controlled by the Gleizeses that served as an investment vehicle for the Gleizeses' investments in NDD described above.

q.    Laurent Graesel, a French national, invested a total of $ 36,927.00 in NDD in November 2013, all through Defendants.

r.    Francois Hetier, a French national, through Hetier LLC, invested $24,861.28 in NDD in July and August 2014, all through Defendants.

s.    Hetier LLC is a Nevada entity fully owned and controlled by Mr. Hetier that served as an investment vehicle for Mr. Hetier's investments in NDD described above.

t.    Christian and Blanche Jean, both French nationals, invested a total of $204,885.00 in NDD in February and March 2014, all through Defendants.

u.    Thierry Jungmichel, a French national, through T.J. and Co LLC, invested a total of $114,085.50 in NDD between February and October 2014, all through Defendants.

v.    T.J. and Co LLC is a Montana entity fully owned and controlled by Mr. Jungmichel that served as an investment vehicle for Mr. Jungmichel's investments in NDD described above.

w.    Alain Lecanuet, a French national, invested a total of $201,963.00 in NDD in June and July 2014, all through Defendants, and received back $118,141.92 that had not yet been transferred to NDD when the scheme collapsed.

x.    Gwendoline Moniez, a French national, through DAKOLINE LLC,

7

invested a total of $62,966.00 in NDD in November and December 2014, all through Defendants, and received back $785.04 that had not yet been transferred to NDD when the scheme collapsed.

y.    DAKOLINE LLC is a North Dakota entity fully owned and controlled by Ms. Moniez that served as an investment vehicle for Ms. Moniez's investments in NDD described above.

z.    Stephane Perrotte, a French national, through Knet LLC, invested a total of $188,417.00 in NDD in November and December 2013, all through Defendants, and received back $3,772.00 that had not yet been transferred to NDD when the scheme collapsed.

aa.    Knet LLC is a North Dakota entity fully owned and controlled by Mr. Perrotte that served as an investment vehicle for Mr. Perrotte's investments in NDD described above.

bb.    Romain Reboul, a French national, through DAKOLAND LLC, invested a total of $ 178,303.00 in NDD between November 2013 and June 2014, all through Defendants, and received back $60,000.00 that had not yet been transferred to NDD when the scheme collapsed.

cc.    DAKOLAND LLC is a North Dakota entity fully owned and controlled by Mr. Reboul that served as an investment vehicle for Mr. Reboul's investments in NDD described above.

dd.    Laurence Ricouard, a French national, invested a total of $42,555.00 in NDD between June 2014 and March 2015, all through Defendants, and received back $17,507.50 that had not yet been transferred to NDD when the scheme

collapsed.

ee.     Marc Robiolle, a French national, through Mamici Dakota LLC, invested $345,244.31 in NDD between December 2013 and March 2015, all through Defendants.

ff.     Mamici Dakota LLC is a North Dakota entity fully owned and controlled by Mr. Robiolle that served as an investment vehicle for Mr. Robiolle's investments in NDD described above.

gg.     Monique Sirgue, a French national, invested a total of $85,835.00 in NDD in February 2015, all through Defendants.

hh.     Raphael Winterstein, a French national, invested a total of $51,995.00 in NDD between February and June 2014, all through Defendants.

21.     Defendant Paul De Bastos ("De Bastos") is an individual and dual-citizen of the United States and France. De Bastos is a resident of the state of Florida. Defendant conducted extensive business and engaged in numerous communications with North Dakota entities, and traveled to North Dakota, in connection with his sales of NDD securities to Plaintiffs and others.

22.     Defendant Paul Real Estate, Inc. ("Paul Real Estate") is a Florida corporation with its principal place of business in Plantation, Florida. Defendant De Bastos is president of Paul Real Estate.

23.     At all relevant times, Defendant Paul Real Estate was an *alter ego* of Defendant De Bastos. Defendant Paul Real Estate is the entity through which De Bastos perpetrated his NDD securities sales to Plaintiffs and others, and obtained his sales commissions for such securities sales.

## IV. FACTS

9

A.     **NDD Perpetrates a Fraudulent Real Estate Investment Scheme, with Defendants' Help and Assistance.**

24.     Defendants, as agents of NDD, offered and sold, and materially assisted NDD in selling investments in four ostensibly separate projects:  Great American Lodged – Watford City West, Great American Lodge – Culbertson, Transhudson – Parshall, and Great American Lodge – Watford City East. NDD offered the investments to investors in the United States, the United Kingdom, France, Spain, Australia, Singapore, and various other countries.

25.     Investments in NDD's four projects were structured similarly.  In each instance, investors purchased a "unit" or "units" in one or more of NDD's projects for approximately $50,000.00 to $90,000.00 per unit.  Each unit represented a fractional interest in a modular housing unit at one of the four sites, and was coupled with a management agreement pursuant to which NDD was to manage the units as an integrated man-camp.

26.     NDD's collective management of the units as an integrated man camp was an essential element of the investment. NDD "recommended" that investors select it to manage their units pursuant to the management agreement, and required investors who chose another person or entity to manage their units pay an exorbitant annual lease fee of $24,000.00 per unit.  NDD intended the $24,000.00 lease fee to be so uneconomical as to dissuade investors from choosing that option, and it appears every NDD investor agreed to have NDD manage the units purchased.

27.     All Plaintiffs agreed to have NDD manage the units they were to purchase, and entered into a management agreement with NDD.

28.     Pursuant to the management agreement, NDD agreed to pay either a fixed return to investors of up to 25 percent per year (which NDD variously referred to as "guaranteed" and "assured") or a variable rate of return based on half of the gross rents it collected.

29.     Approximately 900 to 1,000 investors ultimately purchased units in one of the four

NDD developments.

30.     Investors bought "units" in NDD's projects motivated by the potential returns that NDD would provide by allowing NDD to jointly manage all of the units in a fully-developed "man camp," complete with amenities typically found in a hotel or motel.

31.     While NDD marketed its investments as purchases of "units" in real estate developments, the investments were in reality securities under federal and North Dakota's securities law.

32.     Although NDD investor "units" represented a fractional interest in a modular housing unit at one of the four sites, investors were never provided with a title or deed to the property or any other documentation evidencing their ownership.

33.     Despite the lucrative returns NDD promised – and unbeknownst to investors, including Plaintiffs, none of the NDD projects ever made a profit.  Indeed, of the four sites, only Great American Lodge – Watford City West ever became operational.  That location has a completed amenities building, with services such as food services and laundry, and more than 430 individual housing units that were available to be rented.  There were also approximately 70 units that were not completed.

34.     Great American Lodge – Watford City West ceased operations when electric service to the site was shut off on in May 2015 due to non-payment.  In addition, due to a problem with the water service at the site, water was being trucked in every few days at considerable cost.  The receiver has concluded that it is not economically feasible to reopen Great American Lodge – Watford City West.

35.     Great American Lodge – Culbertson never became operational.   There are approximately 132 individual housing units on the site, but no amenities building.  NDD attempted

to obtain a certificate of occupancy for 44 of the units in spring 2015 but failed the required inspection.

36.     The Transhudson – Parshall site was abandoned at the ground-leveling phase.

37.     The Great American Lodge – Watford City East site never received governmental approval and construction never began.

38.     Unbeknownst to its investors, including Plaintiffs, the NDD real estate investment program was fraudulent. It failed to disclose, among others, that:

> a.     NDD was offering unregistered and nonexempt securities, in violation of the state and federal securities rules and regulations;
>
> b.     NDD was selling securities through unlicensed agents – such as Defendants – in violation of the securities rules and regulations
>
> c.     the NDD projects were not profitable;
>
> d.     the NDD projects were never built, except for the Watford City West project, which was of such poor quality that it could not generate a profit;
>
> e.     the NDD perpetrators were paying exorbitant commissions to salespersons such as Defendants, with the investors' money;
>
> f.     the NDD perpetrators were siphoning enormous amounts of money from NDD and using it for personal purposes;
>
> g.     NDD was a fraudulent, Ponzi scheme.

**B.     NDD, with Defendants' Assistance, Perpetrated an Unregistered and Nonexempt Securities Offering to the Investing Public, Including Plaintiffs.**

39.     Unbeknownst to Plaintiffs, the real estate investment "opportunities" offered by NDD were securities, and NDD – through sales agents such as Defendants – was orchestrating an unregistered and nonexempt securities offering, in violation of the state and federal securities laws

and regulations.

40.     Specifically, the NDD projects offered to investors by Defendants and other sales agents were "investment contracts" and therefore securities under the Securities Act and the Exchange Act. The definition of a "security" under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 77c(a)(10)] includes "any. . . participation in any profit-sharing agreement [or] . . . investment contract."

41.     The United States Supreme Court – in addition to numerous lower courts across the country – has repeatedly opined on the subject of sale-and-leaseback programs similar to the NDD Scheme, and has found such sale-and-leaseback arrangements are "investment contracts" within the meaning of federal securities laws.  *See, e.g., SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (citrus groves sold to investors, coupled with management agreements where the sellers purported to manage the groves and pay passive returns to investors create "investment contract" securities) and *SEC v. Edwards*, 540 U.S. 389 (2004) (payphones sold to investors, coupled with management agreements where the sellers purported to manage the payphones and pay passive returns to investors create "investment contract" securities).

42.     The NDD Scheme investments were investment contracts because investors made an investment of money in a common enterprise with an expectation of profits to be derived solely from the efforts of the NDD Scheme.

43.     The NDD Scheme – through Defendants acting as their sales agents – marketed the projects to Plaintiffs as "investments" and referred to the prospective purchasers as "investors."

44.     Plaintiffs and other investors sent money to NDD with the expectation of sharing in profits from NDD's real estate development activities.

13

45.     Consistent with the management agreements, investors expected that NDD would pool investor funds to develop each project, manage investor units collectively once the project was operational, and distribute profits based on the project's overall success.

46.     NDD also promised investors returns "regardless of the actual rental income received, whether higher or lower than the actual income derived from the unit.

47.     NDD structured the investment contract to ensure that none of the investors chose to manage their own unit.

48.     NDD "strongly" recommended that investors select it to manage the unit.  It also required investors to pay a punitive "lease" payment for renting the ground under their unit, a payment that NDD waived if an investor agreed to have it manage the unit.

49.     Furthermore, NDD's promise of "guaranteed" returns was only available if NDD managed the unit.

50.     Unsurprisingly, each of the investors – including Plaintiffs – selected NDD to manage their unit.

51.     Investors – including Plaintiffs – expected the profits to come solely from NDD's real estate development and management activities. The investors were not required or expected to do anything besides provide funds in order to receive their returns.  NDD described investors' roles as "passive" in marketing materials.

52.     NDD's offerings of real estate "opportunities" were therefore securities.

53.     None of the NDD securities Defendants offered and sold to Plaintiffs were registered with the Securities and Exchange Commission or any state securities regulator including the North Dakota Securities Department.  Likewise, none of the sales were made by or through a broker-dealer or agent registered under N.D.C.C. § 10-04-10.

54.    None of the NDD securities Defendants sold to Plaintiffs were exempt from registration, under the federal or North Dakota securities laws and regulations.

55.    Thus, NDD – with crucial assistance from Defendants, who acted as salespersons for those securities – perpetrated an unregistered, nonexempt securities offering, in violation of the state and federal securities laws.

56.    NDD, through Defendants and with their crucial assistance and participation, made these offerings through general advertising, including an Internet website, commissioned sales agents – including Defendants –, print and online advertisements, e-mail solicitations, seminars, direct in-person solicitations, conference calls, videos, and flyers. These sales efforts constituted a general solicitation for the purchase of securities under North Dakota and federal law.

**C.    The NDD Offering Constituted an Integrated Offering of Unregistered Securities.**

57.    NDD's offerings constituted a single, integrated securities offering.

58.    NDD, through its agents such as Defendants, marketed and sold the investments during overlapping time frames over a considerable period of time, and via similar and interrelated methods.

59.    All NDD projects were managed, overseen, and promoted by the same individuals.

60.    All NDD projects raised money for the same purported purpose, and the description of such purpose is nearly identical in all the NDD projects' offering documents: to develop and manage short-term housing for those employed in the oil industry in the Bakken oil field region of North Dakota and Montana.

61.    The investments were all of the same type and class, as all involved investment contracts featuring fractional ownership in modular housing units in the same geographic area coupled with management agreements pursuant to which NDD would manage the units.

62.     As more fully described above, money invested in the NDD projects was commingled, misappropriated, used for the benefit of Hogan and Gavin, and used to make Ponzi-like payments to early investors.

63.     The investments were part of a single plan of financing, were integrated, and resulted in the commingling of funds that NDD and its principals diverted for unauthorized purposes.

64.     Accordingly, the securities NDD offered and sold with Defendant's active assistance were part of a single plan of financing, were integrated, and comprised a single, unitary, and fraudulent securities offering that victimized Plaintiffs and all other NDD Scheme investors.

65.     Thus, Plaintiffs are equally situated in that they all invested in the NDD Ponzi Scheme rather than in specific real estate units.

**D.     NDD and Its Principals Divert Investor Funds and Defraud the NDD Investors.**

66.     Unbeknownst to Plaintiffs, NDD and its principals Robert Gavin and Daniel Hogan diverted various funds raised in connection with the NDD Offering for unauthorized purposes.

67.     NDD raised approximately $62 million in connection with the NDD Offering. Notwithstanding the lack of progress on NDD's projects, less than $100,000.00 remained in NDD's main operating account as of February 2015.

68.     After investor funds were disbursed into NDD's operating account, Gavin, and Hogan treated the funds like their personal slush fund.

69.     Rather than use investor funds on the NDD projects, Gavin and Hogan used the funds for other unrelated projects for their own benefit.

70.     For example, Gavin and Hogan used $1.9 million of investor funds from NDD's main operating account to finance an oil and gas project in the name of Augusta Exploration, LLC.

16

71.     Beginning in February 2013, Gavin and Hogan used at least $5.5 million of investor funds from NDD's main operating account to engage in several real estate transactions unrelated to any investor project, including:

    a.     $1.65 million for the purchase of approximately 19 acres of land near Williston, North Dakota in the name of NDD Holdings 1 LLC;

    b.     $1.395 million for the purchase of approximately 2.3 acres of land in Williston, North Dakota in the name of NDD Holdings 1 LLC;

    c.     $1.19 million in connection with a lease-to-own real estate transaction in Trenton, North Dakota;

    d.     $686,000 for the purchase of land for a single-family residential development called Horizon Ridge in the name of NDD Holdings 2 LLC; and

    e.     $500,000 for the purchase of real estate and inventory in Central City, Nebraska in the name of NDD Modular, LLC.

72.     Gavin and Hogan also misappropriated more than $1.3 million for their direct personal benefit.  Hogan transferred more than $1 million from NDD's operating account to his personal account in the United States and transferred $350,000 from NDD's operating account to a bank account in Malaysia for Gavin's benefit.

73.     In addition, Gavin and Hogan spent at least $2.2 million of investor funds on items characterized by NDD as administrative overhead, including over $1.97 million transferred from NDD's operating account into bank accounts in the United Kingdom in the name of NDD UK. These funds were used to, among other things, provide additional compensation to Gavin and Hogan and pay commissions.

74.     NDD did not disclose to investors that their funds would be diverted to fund other

17

projects beneficially owned by Gavin and Hogan.  This information would have been material to investors.

75.     NDD used agents including Defendants to procure investor funds for their scheme. NDD paid these agents a minimum of 10 percent and, depending on the amount of funds raised by the agent, up to 20 percent of amounts raised as commissions.

76.     NDD ultimately paid more than $10.3 million to agents—approximately 16.5 percent of the total funds raised.  NDD did not disclose to investors in the offering materials or otherwise that it paid such commissions, nor did it instruct the agents to disclose the existence of such commissions to the investors.

77.     NDD also used the proceeds of the sale of interests in Great American Lodge – Culbertson, Transhudson – Parshall, and Great American Lodge – Watford City East to pay purported "returns" to investors in Great American Lodge – Watford City West.  Upon information and belief, NDD paid more than $2.4 million from later-stage investors to pay returns to earlier investors.  Of course, this diversion of funds was not disclosed to investors.

**E.     Defendants Offer and Sell Unregistered NDD Securities to Plaintiffs Without a Securities License, and Materially Assist and Participate in the Unlawful NDD Offering.**

78.     Defendants played a crucial role in the fraudulent NDD securities offering to Plaintiffs and other investors, as salespersons and aiders of the NDD Scheme.

79.     Specifically, Defendants offered and sold the unregistered and nonexempt NDD securities to Plaintiffs, and actively and substantially assisted NDD in offering and selling unregistered and nonexempt securities to the public including Plaintiffs.

80.     Defendants never had a securities license and were never affiliated with a securities-licensed broker-dealer firm, during the time they offered and sold the NDD securities to

18

Plaintiffs.

81.     Defendants worked closely with the NDD Scheme perpetrators, in North Dakota and elsewhere, to prepare marketing materials targeting Plaintiffs and offering the unregistered NDD securities.

82.     Defendants negotiated with the NDD Scheme perpetrators and accepted a compensation based on sales commissions for their sales of unregistered NDD securities to Plaintiffs.

83.     Defendants' compensation was exorbitant: upon information and belief Defendants received as much as 20% of Plaintiffs' investments, in sales commissions. Upon information and belief, Defendant De Bastos earned commissions of over $1,000,000 on the sales of the NDD securities to investors.

84.     Such sales commissions were never disclosed to Plaintiffs.

85.     The sales commissions would have been material to Plaintiffs' investment decision because they substantially diminished the amounts available to be invested and to generate the promised investment returns to Plaintiffs.

86.     Defendants approached each and every Plaintiff and offered to them the NDD "investment opportunity."

87.     Defendants gave each and every Plaintiff investment-related brochures and pamphlets that described the NDD investment opportunity, and described the NDD investment opportunities based on the information in those pamphlets and brochures.

88.     The information conveyed to Plaintiffs by Defendants, regarding the NDD investments, was as glowing as it was false. Defendants omitted to disclose to Plaintiffs any of the crucial issues surrounding the investments described above.

19

89.     Defendants also failed to disclose to Plaintiffs that:

a.      The NDD investments were securities, and such securities were unregistered and nonexempt;

b.      Defendants were not licensed to sell securities.

c.      Defendants had not conducted any adequate – if at all – investigation and evaluation of the NDD investments prior to presenting them to Plaintiffs;

d.      Defendants had no basis for their representations to Plaintiffs regarding NDD and the NDD investment "opportunity";

e.      Defendants had no basis to recommend the NDD securities to Plaintiffs;

f.      Defendants were getting paid exorbitant sales commissions for their sales;

90.     All such omissions were material to Plaintiffs' investment decision.

91.     Defendants urged Plaintiffs to invest in NDD, based on their false and material misrepresentations and omissions.

92.     Defendants instructed Plaintiffs that, in order to invest, Plaintiffs must transfer their investment proceeds to North Dakota; send their investment-related paperwork to North Dakota; and communicate with the escrow agent in North Dakota regarding their investments.

93.     Plaintiffs, in reliance upon Defendants' fraudulent misrepresentations and omissions, invested in the unregistered and fraudulent NDD securities, on the dates and in the amounts set forth above in paragraph 20.

94.     Defendants assisted Plaintiffs with the investment-related paperwork and directed

such paperwork to be sent to North Dakota.

95.     Defendants also assisted Plaintiffs in transferring their funds to North Dakota and communicated with North Dakota-based NDD agents to facilitate Plaintiffs' investments.

96.     Defendants received substantial sales commissions, believed to be over a million dollars, from North Dakota-based NDD, for their fraudulent and unlicensed sales of unregistered securities to Plaintiffs.

**F.     The NDD Scheme Is Exposed by the SEC, Collapses, Plaintiffs Lose Their Investments.**

97.     As NDD's unlawful sale of unregistered securities through Defendants and other agents, and their other unlawful conduct, began coming to light, the Securities Exchange Commission brought suit against NDD, its principals Robert Gavin and Daniel Hogan, and various other relief defendants, alleging violation of the federal securities laws.  *See* SEC v. North Dakota Developments, LLC et al., U.S. District Court, District of North Dakota, Case. No. 15-00053, filed on May 5, 2015.

98.     According to the SEC's complaint, NDD and its principals directly or indirectly made material misrepresentations and omissions regarding the use of investor funds, the payment of commissions, and the anticipated return on the investment.

99.     The SEC alleged, among other things, that NDD made Ponzi-style payments to early investors by paying their "guaranteed" returns using funds raised from later investors.  The SEC also alleged that instead of developing the four projects as promised, NDD and its principals misappropriated more than $25 million of investor funds to pay undisclosed commissions to agents and compensation to Gavin and Hogan, and make investments in unrelated projects for Gavin and Hogan's personal benefit.

100.     The SEC also alleged that the NDD investments were securities in the form of

21

"investment contracts," were not registered with the SEC, and were not exempt from registration.

101.    The SEC also alleged that NDD engaged into an offering of unregistered securities, in violation of the securities laws and regulations.

102.    On May 5, 2015, the North Dakota Securities Department served a Cease and Desist Order on NDD alleging, among other things, that the NDD Offering constituted an unregistered, non-exempt sale of investment contracts (i.e., securities) within the meaning of N.D.C.C. § 10-04-02(19) and that NDD and its principals made misrepresentations and omissions of material fact in connection with the sale of securities in violation of N.D.C.C. § 10-04-15(2).

103.    At the SEC's request, attorney Gary Hansen was appointed Receiver for NDD by the Court.  According to the Receiver's initial report dated June 26, 2015, although NDD is believed to have raised more than $62 million in connection with the NDD Offering, he had only located approximately $175,000.00 in cash and liquid assets owned by NDD.

**F.    The North Dakota Securities Commissioner Serves Defendants with a Cease and Desist Order.**

104.    On June 17, 2015, shortly after the SEC initiated its action against NDD, the North Dakota Securities Commissioner served a Cease and Desist Order on Defendants alleging, among other things, that the NDD securities that Defendants offered for sale and sold were neither exempt and nor registered with the North Dakota securities department, and that Defendant De Bastos was not a registered agent with the North Dakota securities department, all in violation of North Dakota law.

105.    Accordingly, the North Dakota Securities Commissioner ordered Defendants to cease and desist from:

> a.    Offering for sale or selling securities in North Dakota unless and until such securities have been registered with the North Dakota securities department.

b.      Offering for sale or selling securities, or effecting transactions in securities, in North Dakota unless and until Defendants have registered as broker-dealers or agents.

c.      Using material misstatements or omissions, engaging in a scheme or artifice to defraud investors, or engaging in any fraudulent or deceptive practice, in connection with the offer and/or sale of securities in North Dakota.

106.    The North Dakota Securities Commissioner also notified Defendants that their violations of North Dakota law subjected them to civil penalties of up to $10,000.00 per violation, and expressly reserved the right to assess such penalties.

107.    Thus, Plaintiffs have lost the vast majority of their investments as a result of Defendants' sales of NDD securities to them.

108.    Plaintiffs now bring this action against Defendants for damages arising from Defendants' actions as NDD's agent and their conduct in actively assisting NDD in connection with the NDD Offering. *See* N.D.C.C. § 10-04-17 (providing that every "agent of or for [a] seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser.").

**COUNT I**
**(For Liability Under the Securities Exchange Act of 1934, 15 U.S.C. § 78j and SEC Rule 10b-5 – as against Defendant Paul De Bastos)**

109.    Plaintiffs incorporate the above paragraphs by reference.

110.    Defendant Paul De Bastos violated §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 in that he:

a.      Employed devices, schemes and artifices to defraud Plaintiffs;

b.      Made untrue statements of material facts or omitted to state material facts

23

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs; and/or

c.       Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs,

all in connection with the purchase or sale of NDD securities.

111.    Defendant De Bastos violated Section 10(b)-5 of the Securities Exchange Act of 1934 (15 U.S.C. § 78(j)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) by, in connection with the offer or sale of NDD securities to Plaintiffs, defrauding and deceiving Plaintiffs and making untrue statements of a material fact and omitting to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

112.    Such untrue, material statements and omissions included:

a.       Assuring Plaintiffs that the NDD "opportunities" he was offering and selling them were real estate investments, when in reality they were securities;

b.       Failing to disclose to Plaintiffs that the NDD investments were securities, and such securities were unregistered and nonexempt;

c.       Failing to disclose that Defendants were not licensed to sell securities;

d.       Misrepresenting the characteristics and performance of the NDD programs to Plaintiffs and failing to disclose that Defendants had not conducted any adequate – if at all – investigation and evaluation of the NDD investments prior to presenting them to Plaintiffs;

e.       Failing to disclose that Defendants had no basis for their representations and/or recommendations to Plaintiffs regarding NDD and

24

the NDD investment "opportunities";

f.     Failing to disclose that Defendants were getting paid exorbitant sales commissions for their sales of NDD investments to Plaintiffs;

113.    Each of Defendant De Bastos's above-described misrepresentations and omissions was material.

114.    Plaintiffs reasonably relied to their detriment on Defendant De Bastos's above-described material misrepresentations and omissions.

115.    Defendant De Bastos knew such misrepresentations and omissions to be untruthful, knew that they would be material to Plaintiffs and that Plaintiffs would rely upon them to their detriment, and indeed intended Plaintiffs to rely on such misrepresentations and omissions and invest in the NDD programs, so that Defendant may be paid the exorbitant sales commissions he received for such investments.

116.    Plaintiffs did not discover and could not have reasonably discovered Defendant De Bastos's misrepresentations and omissions until May 5, 2015, when the NDD scheme was exposed.

117.    Plaintiffs were damaged as a direct and proximate result of Defendant De Bastos's violations in an amount to be proven at trial.

## COUNT II
### (For Liability Under the Securities Exchange Act of 1934, 15 U.S.C. § 78j and SEC Rule 10b-5 – as against Defendant Paul Real Estate)

118.    Plaintiffs incorporate the above paragraphs by reference.

119.    Defendant Paul Real Estate violated §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 in that it:

a.     Employed devices, schemes and artifices to defraud Plaintiffs;

25

      b.      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs; and/or

      c.      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs,

all in connection with the purchase or sale of NDD securities.

120.     Defendant Paul Real Estate violated Section 10(b)-5 of the Securities Exchange Act of 1934 (15 U.S.C. § 78(j)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) by, in connection with the offer or sale of NDD securities to Plaintiffs, defrauding and deceiving Plaintiffs and making untrue statements of a material fact and omitting to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

121.     Such untrue, material statements and omissions included:

      a.      Assuring Plaintiffs that the NDD "opportunities" he was offering and selling them were real estate investments, when in reality they were securities;

      b.      Failing to disclose to Plaintiffs that the NDD investments were securities, and such securities were unregistered and nonexempt;

      c.      Failing to disclose that Defendants were not licensed to sell securities;

      d.      Misrepresenting the characteristics and performance of the NDD programs to Plaintiffs and failing to disclose that Defendants had not conducted any adequate – if at all – investigation and evaluation of the NDD investments prior to presenting them to Plaintiffs;

      e.      Failing to disclose that Defendants had no basis for their

26

representations and/or recommendations to Plaintiffs regarding NDD and the NDD investment "opportunities";

f.      Failing to disclose that Defendants were getting paid exorbitant sales commissions for their sales of NDD investments to Plaintiffs;

122.    Each of Defendant Paul Real Estate's above-described misrepresentations and omissions was material.

123.    Plaintiffs reasonably relied to their detriment on Defendant Paul Real Estate's above-described material misrepresentations and omissions.

124.    Defendant Paul Real Estate knew such misrepresentations and omissions to be untruthful, knew that they would be material to Plaintiffs and that Plaintiffs would rely upon them to their detriment, and indeed intended Plaintiffs to rely on such misrepresentations and omissions and invest in the NDD programs, so that Defendant may be paid the exorbitant sales commissions he received for such investments.

125.    Plaintiffs did not discover and could not have reasonably discovered Defendant Paul Real Estate's misrepresentations and omissions until May 5, 2015, when the NDD scheme was exposed.

126.    Plaintiffs were damaged as a direct and proximate result of Defendant Paul Real Estate's violations in an amount to be proven at trial.

## COUNT III
### (For Liability Under North Dakota Securities Act, N.D.C.C. § 10-04-17 – Offering and Selling Unregistered Securities – Strict Liability as against Defendant Paul De Bastos)

127.    Plaintiffs incorporate the above paragraphs by reference.

128.    Defendant De Bastos and NDD violated N.D.C.C. § 10-04-04 by offering and selling securities in the NDD offering that were neither registered nor exempt from registration as described hereinabove.

27

129.    Under N.D.C.C. § 10-04-02.13, an "offer to sell" securities is defined as "every attempt or offer to dispose of, or solicitation of an order or offer to buy, a security or interest in a security for value."

130.    Under N.D.C.C. § 10-04-02.14, "sale" or "sell" means "every sale, contract to sell, or disposition of a security or interest in a security for value, and every contract to make any such sale or disposition.

131.    Under N.D.C.C. § 10-04-02.1, "agent" means "an individual … who represents … an issuer or is self-employed in effecting or attempting to effect purchases or sales of securities." N.D. Cent. Code § 10-04-02.

132.    Under N.D.C.C. § 10-04-17, every sale of unregistered securities is voidable at the election of the purchaser, and the seller – as well as any agents of the seller "who shall have participated or aided *in any way* in making such sale" – are jointly and severally liable to such purchaser. N.D. Cent. Code § 10-04-17(1) (*emphasis supplied*).

133.    Defendant De Bastos – as "offeror"/"seller" of NDD securities as well as "agents" of NDD - are jointly and severally liable to Plaintiffs for their sales of NDD unregistered securities, in violation of the North Dakota Securities Act.

134.    Pursuant N.D.C.C. § 10-04-17, Plaintiffs hereby tender their NDD securities to Defendant De Bastos and demand that Defendant De Bastos refund to them the entire amount they paid for the NDD securities, together with interest from the date of payment to the date of repayment, court costs, and attorney's fees.

## COUNT IV

**(For Liability Under North Dakota Securities Act, N.D.C.C. § 10-04-17 – Offering and Selling Unregistered Securities – Strict Liability as against Defendant Paul Real Estate)**

135.    Plaintiffs incorporate the above paragraphs by reference.

136.    Defendant Paul Real Estate and NDD violated N.D.C.C. § 10-04-04 by offering and selling securities in the NDD offering that were neither registered nor exempt from registration as described hereinabove.

137.    Under N.D.C.C. § 10-04-02.13, an "offer to sell" securities is defined as "every attempt or offer to dispose of, or solicitation of an order or offer to buy, a security or interest in a security for value."

138.    Under N.D.C.C. § 10-04-02.14, "sale" or "sell" means "every sale, contract to sell, or disposition of a security or interest in a security for value, and every contract to make any such sale or disposition.

139.    Under N.D.C.C. § 10-04-02.1, "agent" means "an individual … who represents … an issuer or is self-employed in effecting or attempting to effect purchases or sales of securities." N.D. Cent. Code § 10-04-02.

140.    Under N.D.C.C. § 10-04-17, every sale of unregistered securities is voidable at the election of the purchaser, and the seller – as well as any agents of the seller "who shall have participated or aided *in any way* in making such sale" – are jointly and severally liable to such purchaser. N.D. Cent. Code § 10-04-17(1) (*emphasis supplied*).

141.    Defendant Paul Real Estate – as "offeror"/"seller" of NDD securities as well as "agents" of NDD - are jointly and severally liable to Plaintiffs for their sales of NDD unregistered securities, in violation of the North Dakota Securities Act.

142.    Pursuant N.D.C.C. § 10-04-17, Plaintiffs hereby tender their NDD securities to Defendant Paul Real Estate and demand that Defendant Paul Real Estate refund to them the entire amount they paid for the NDD securities, together with interest from the date of payment to the date of repayment, court costs, and attorney's fees.

**COUNT V**

**(For Liability Under North Dakota Securities Act, N.D.C.C. § 10-04-17 – Sales of Securities by Unlicensed Agents - Strict Liability – as against Defendant Paul De Bastos)**

143.    Plaintiffs incorporate the above paragraphs by reference.

144.    Defendant De Bastos violated N.D.C.C. § 10-04-10 by selling NDD securities to Plaintiffs as an unregistered agent.

145.    Under N.D.C.C. § 10-04-02.1, "agent" means "an individual … who represents … an issuer or is self-employed in effecting or attempting to effect purchases or sales of securities." N.D. Cent. Code § 10-04-02.

146.    Under N.D.C.C. § 10-04-17, every sale of securities by unregistered agents is voidable at the election of the purchaser, and the seller – as well as any agents of the seller "who shall have participated or aided *in any way* in making such sale" – are jointly and severally liable to such purchaser. N.D. Cent. Code § 10-04-17(1) (*emphasis supplied*).

147.    Defendant De Bastos – as a "seller" of NDD securities and "agent" of NDD – is jointly and severally liable to Plaintiffs for their sales of NDD securities as unregistered agents, in violation of the North Dakota Securities Act.

148.    Pursuant N.D.C.C. § 10-04-17, Plaintiffs hereby tender their NDD securities to Defendant De Bastos and demand that Defendant De Bastos refund to them the entire amount they paid for the NDD securities, together with interest from the date of payment to the date of repayment, court costs, and attorney's fees.

**COUNT VI**

**(For Liability Under North Dakota Securities Act, N.D.C.C. § 10-04-17 – Sales of Securities by Unlicensed Agents - Strict Liability – as against Defendant Paul Real Estate)**

149.    Plaintiffs incorporate the above paragraphs by reference.

150.    Defendant Paul Real Estate violated N.D.C.C. § 10-04-10 by selling NDD securities to Plaintiffs as an unregistered agent.

151.    Under N.D.C.C. § 10-04-02.1, "agent" means "an individual … who represents … an issuer or is self-employed in effecting or attempting to effect purchases or sales of securities." N.D. Cent. Code § 10-04-02.

152.    Under N.D.C.C. § 10-04-17, every sale of securities by unregistered agents is voidable at the election of the purchaser, and the seller – as well as any agents of the seller "who shall have participated or aided *in any way* in making such sale" – are jointly and severally liable to such purchaser. N.D. Cent. Code § 10-04-17(1) (*emphasis supplied*).

153.    Defendant Paul Real Estate – as a "seller" of NDD securities and "agent" of NDD – is jointly and severally liable to Plaintiffs for their sales of NDD securities as unregistered agents, in violation of the North Dakota Securities Act.

154.    Pursuant N.D.C.C. § 10-04-17, Plaintiffs hereby tender their NDD securities to Defendant Paul Real Estate and demand that Defendant Paul Real Estate refund to them the entire amount they paid for the NDD securities, together with interest from the date of payment to the date of repayment, court costs, and attorney's fees.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment:

1.    Awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial;

2.      Awarding statutory attorneys' fees and costs, and other relief;

3.      Granting such other relief as to this Court may seem just and proper.

Dated:  September 22, 2016                    SCHNEIDER, SCHNEIDER & SCHNEIDER

*/s/ Mac Schneider*

Mac J. Schneider
317 ½ Kittson Ave.
Grand Forks, ND 58201
Telephone:  (701) 757-2050
Facsimile:  (701) 757-2051
E-Mail: mac@schneiderlawfirm.com

PEIFFER, ROSCA, WOLF,
ABDULLAH, CARR & KANE
A PROFESSIONAL LAW CORPORATION
Alan L. Rosca (*pro hac vice to be submitted*)
James P. Booker (*pro hac vice to be submitted*)
1422 Euclid Avenue, Suite 1610
Cleveland, Ohio 44115
Telephone:  (216) 570-0097
Facsimile:  (888) 411-0038
E-Mail:  arosca@prwlegal.com
            jbooker@prwlegal.com

HUDSON, MALLANEY, SHINDLER &
ANDERSON, P.C.
J. Barton Goplerud (*pro hac vice to be submitted*)
Brian O. Marty (*pro hac vice to be submitted*)
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone:  (515) 223-4567
Facsimile:  (515) 2223-8887
E-Mail: jbgoplerud@hudsonlaw.net
            bmarty@hudsonlaw.net

*Counsel for Plaintiffs*